IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS


WILL A. WIMBLEY          )
                            )
              Petitioner,   )    **CIVIL ACTION**
                            )
v.                          )    No. 04-3320-MLB
                            )
ROGER WERHOLTZ, et al.    )
                            )
              Respondents.  )


## MEMORANDUM AND ORDER

## I.  INTRODUCTION

This case comes before the court on petitioner's application for a writ of habeas corpus under 28 U.S.C. § 2254.  (Doc. 1.)  The matter has been fully briefed and is ripe for decision.  (Docs. 2, 15, 18.) The application is DENIED for reasons set forth herein.

Petitioner was convicted of first-degree murder and criminal possession of a firearm in state court and sentenced to life in prison without the possibility of parole for 40 years.  In a federal habeas proceeding, the state court's factual findings are presumed correct and petitioner bears the burden of rebutting that presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  Accordingly, the court incorporates the Kansas Supreme Court's version of the facts:[1]

> On February 10, 1999, the body of Tina
> Cooper, a.k.a Leola Christina Haskins, was found
> next to a bike path at 12th and Matthewson in
> Wichita.  Her shoes and day planner were near her

---

[1] Petitioner submitted his own statement of facts; however, a review of his account shows that it is not materially different from the summary given by the Kansas Supreme Court.  In fact, petitioner's facts are frequently copied directly from the state court's opinion. (Doc. 2 at 1-3.)

body, and police found a bloody pillowcase and comforter nearby.  DNA testing revealed that the blood was consistent with that of the victim.  An autopsy revealed that the victim had suffered several gunshot wounds.  Stippling and soot in the wounds indicated that many had been inflicted at very close range.  The body also had contusions and abrasions.

Suspicion focused on the defendant, who was the victim's ex-boyfriend.  The defendant and the victim had been together for more than 2 years.  Their relationship was a discordant one, and police had been called to intervene numerous times when the defendant had beaten her.  On one occasion, she told officers that the defendant beat her when she tried to end her relationship with him.  The woman who raised the victim, Rosemary Cooper, stated that Tina had decided to move out on her own because if she did not leave the defendant, he would wind up killing her.

At approximately 11:30 p.m. on February 9, the day before the body was found, the defendant's car had been impounded by police because it was parked in the driveway of a residence at 1134 N. Indiana and the resident, who did not know the defendant, wanted it removed.  The resident also found a large shirt nearby, which he threw away.  The shirt, which had bloodstains on it, was later recovered by police; DNA testing revealed that the blood was consistent with the victim's blood.  A gun was also found near 1134 N. Indiana.  Testing revealed that the bullets and fragments taken from the victim's body had been fired by that gun.

A warrant was obtained to search the defendant's car, which was parked at the defendant's uncle's house at 1345 N. Indiana, near where the gun and shirt were found.  The defendant often stayed with his uncle in the house and had a key.  When police arrived to search the car, they asked the defendant's uncle, Anther Wilson, if they could have permission to search the house.  Permission was given, and Lieutenant Ken Landwehr entered the house to look for the defendant.  While looking for the defendant, Landwehr saw a pillow with a pillowcase matching the one found by the victim's body.

A search warrant was then obtained for the house.  Crime scene investigators discovered a spent cartridge case and some faint bloodstains near the steps of the house and another spent

cartridge case on the porch.  Testing determined that both cartridge cases had come from the gun found earlier.  The blood on the sidewalk was consistent with the blood of the victim.

Inside the house, investigators noticed some discolorations on the carpet, which would be consistent with the carpet having been bleached. Three empty one-quart bottles of Clorox bleach were found in the trash can of the house.  There was no washing machine in the house.  A section of the bleached carpet was cut out and subjected to DNA testing, and it revealed DNA consistent with that of the victim.  An empty ammunition holder designed for the type of ammunition used in the shooting of the victim was found in one of the bedrooms.  The defendant's fingerprints were found on the ammunition holder.  Later, a fingerprint from the defendant was found on the day planner that was near the victim's body.

A woman named Candis Ramirez testified that she stopped by the house at 1345 N. Indiana on the evening of February 9 to buy cocaine and that she bought cocaine from Tina, who was at the house.  She came back a few hours later to buy more cocaine and saw the victim's body lying on the steps to the house.  Ramirez thought that some of the victim's blood had gotten on her shoe when she walked by the body.  DNA testing of the shoe later confirmed that a small drop of the victim's blood was on the shoe.

Paris Andrews, the girlfriend of Anther Wilson, confirmed that the victim was at Anther's house at 1345 N. Indiana on February 9.  Andrews stated that she and Wilson left to play bingo a little after 7 p.m. and did not return until after 10 p.m., at which time they played dominoes in the dining room.  The victim was not there at that time.  While they were playing dominoes, the defendant, accompanied by his friend Eugene Langford, came in and talked to Wilson.  Wilson gave the defendant a bottle of bleach, and the defendant began cleaning up something on the floor.  The defendant told Andrews that he had vomited earlier and was cleaning it up.  The defendant told Wilson and Andrews that his car had stopped running and he needed to borrow Wilson's Jeep.

Andrews told police that after February 9, the defendant dropped from sight.  The defendant's next door neighbor testified that the defendant, who normally let his dogs out in the morning and put them back in the evening, did not return to the house after February 9.

-3-

> Eugene Langford provided an alibi witness for the defendant.  Langford testified that he went to 1345 N. Indiana approximately 6 or 7 p.m. to visit the defendant, and that they played a Sony Playstation game for 2 to 3 hours and then drove to a nearby pool hall.  When they left the pool hall sometime later, the defendant's car would not start.  They managed to get a jump start and drove back towards 1345 N. Indiana. However, the car stalled again, which is why they pushed it into the driveway at 1134 N. Indiana that they thought was vacant.  They then walked to 1345 N. Indiana and borrowed Anther Wilson's Jeep.  They returned to the pool hall where they stayed until approximately 2 a.m.  According to Langford, the defendant could not have killed Tina because the defendant was with him the entire evening.
>
> On the basis of the circumstantial evidence linking him to the murder, as well as a stipulation regarding his prior felony record, the defendant was convicted of premeditated first-degree murder and criminal possession of a firearm.

State v. Wimbley, 271 Kan. 843, 845-47, 26 P.3d 657, 661-62 (2001) (Wimbley I).  Petitioner then appealed to the state supreme court, where he was represented by counsel.  Petitioner also filed a pro se brief in his appellate proceeding.  In an opinion addressing the various issues raised on appeal, the Kansas Supreme Court affirmed his conviction.  Id. at 855, 26 P.3d at 666.  Thereafter, he applied for collateral relief in the state system under K.S.A. 60-1507.  The state habeas court denied relief, and the Kansas Court of Appeals affirmed, Wimbley v. State, No. 90,025 (Kan. Ct. App. May 28, 2004) (Wimbley II), after which, the state supreme court denied review.

Having failed at every turn, petitioner now turns to the federal courts seeking review of his conviction.  Nonetheless, this court's ability to consider collateral attacks on state criminal proceedings is circumscribed by 28 U.S.C. § 2254, as amended by the Antiterrorism

and Effective Death Penalty Act of 1996 (AEDPA).  Under the highly deferential standard set forth in AEDPA, if petitioner's claim has been decided on the merits in a state court, a federal habeas court may only grant relief if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

> A state-court decision is contrary to established federal law under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).  A state-court decision is an unreasonable application of federal law under § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413, 120 S.Ct. 1495. What is "reasonable" is determined under an objective test rather than by, say, determining whether a judge somewhere has so ruled.  See id. at 409-10, 120 S.Ct. 1495.

Bush v. Neet, 400 F.3d 849, 851-52 (10th Cir. 2005).  An inherent limitation to review under § 2254 is that a habeas court will only consider alleged violations of federal law.  Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80 (1991).  Moreover, the court will not normally consider federal questions unless they have first been presented to the state courts.  Picard v. Connor, 404 U.S. 270, 277-78, 92 S. Ct. 509, 513 (1971); but see 28 U.S.C. § 2254(b)(2) (permitting denial on the merits, despite failure to exhaust state remedies).

## II.  ANALYSIS

A.  Exhaustion of State Remedies

Where, as here, the state provides an effective means to correct alleged errors in a petitioner's state criminal proceedings, AEDPA requires each petitioner to exhaust those state remedies before bringing a federal habeas petition.  28 U.S.C. § 2254(b)(1).  While there was a time when respondent's failure to raise the exhaustion issue would have constituted a waiver, <u>Demarest v. Price</u>, 130 F.3d 922, 934 (10th Cir. 1997), AEDPA mandates exhaustion of state remedies unless the respondent expressly waives that requirement.  28 U.S.C. § 2254(b)(3); <u>see also</u> <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1189 (10th Cir. 2002).  In this case, respondents assert that petitioner failed to exhaust at least five claims of error:

> (1) the prosecutor committed misconduct by calling petitioner's alibi witness a liar and misstating the law during closing argument,
> (2) the trial court erred in instructing the jury/constructively amending the firearm possession charge,
> (3) [petitioner's] trial counsel was ineffective for failing to object to same,
> (4) [petitioner's] trial counsel was ineffective for failing to move for a mistrial based on juror misconduct, and
> (5) all claims of ineffective assistance of appellate counsel.

(Doc. 15 at 17-18.)

In determining whether petitioner presents valid federal claims, the court will liberally construe his pro se filings.  <u>Cummings v. Evans</u>, 161 F.3d 610 (10th Cir. 1998).  On the other hand, petitioner was represented by counsel in all of his state court proceedings; thus, when considering whether he fairly presented his federal claims in the state system, no such liberal construction is warranted.

-6-

Nonetheless, the court will liberally construe any pro se filings in the state system.

Regarding the first disputed issue, prosecutorial misconduct during closing argument, petitioner represented to the Kansas Court of Appeals that this matter had been presented to the state habeas court.[2] Wimbley II, Br. of Appellant at 14. A review of the record before the habeas court shows that none of petitioner's motions or briefs raised this issue. See id. R. Vol. I, 15-86. Petitioner's assertion to the contrary was apparently a misrepresentation of the record, as the court of appeals so noted. As a result, the court of appeals found this issue had not been properly raised in the state habeas proceedings, and would not be considered on appeal. Wimbley II at 21-22.

Since this claim was not presented to the state courts, a federal habeas court would ordinarily be prohibited from considering it. Picard, 404 U.S. at 277-78, 92 S. Ct. at 513. Nonetheless, if petitioner would be procedurally barred from now asserting this claim in the state courts based on independent and adequate state grounds, his claim may be considered procedurally defaulted, and therefore exhausted, for habeas purposes. Thomas v. Gibson, 218 F.3d 1213, 1221 (10th Cir. 2000). Under those circumstances, the federal habeas court will only consider his claim if petitioner can demonstrate "cause and

---

[2] More specifically, petitioner claimed his trial counsel was ineffective for failing to object to the alleged prosecutorial misconduct during closing argument. Wimbley II, Br. of Appellant at 14. Subsumed in that claim is the underlying claim that prosecutorial misconduct occurred. A review of the record shows that neither claim was properly presented in the state courts, as more fully described in the text above.

prejudice or a fundamental miscarriage of justice." <u>English v. Cody</u>, 146 F.3d 1257, 1259 (10th Cir. 1998).

"A state procedural ground is independent if it relies on state law, rather than federal law, as the basis for the decision.  For the state ground to be adequate, it must be strictly or regularly followed and applied evenhandedly to all similar claims." <u>Hickman v. Spears</u>, 160 F.3d 1269, 1271 (10th Cir. 1998).  In this case, the Kansas Court of Appeals declined to reach the merits of this prosecutorial misconduct claim because it had not been raised in the initial proceedings under K.S.A. 60-1507.  <u>Wimbley II</u>, at 21-22.  In so ruling, the court relied on <u>Bd. of Lincoln County Comm'rs v. Nielander</u>, 275 Kan. 257, 268, 62 P.3d 247 (2003).  The rule expressed there, that issues not presented to the trial court will not be considered for the first time on appeal, is an age-old Kansas rule that has been routinely followed for decades.  <u>See, e.g.</u>, <u>State v. Vasquez</u>, 272 Kan. 692, 699, 36 P.3d 246, 250 (2001); <u>State v. Smith</u>, 268 Kan. 222, 243, 993 P.2d 1213, 1229 (1999); <u>State v. Alderson</u>, 260 Kan. 445, 459, 922 P.2d 435, 446 (1996); <u>State v. Wooldridge</u>, 237 Kan. 737, 741, 703 P.2d 1375, 1378 (1985); <u>State v. Blair</u>, 197 Kan. 693, 693, 421 P.2d 32, 33 (1966).  In addition to this rule's consistent use in criminal cases on direct appeal, it has also been regularly applied in state habeas proceedings.  <u>See, e.g.</u>, <u>Churchill v. State</u>, 216 Kan. 399, 399, 532 P.2d 1070, 1071 (1975); <u>Young v. State</u>, 206 Kan. 318, 319, 478 P.2d 194, 195 (1970); <u>Tate v. State,</u> 196 Kan. 435, 437, 411 P.2d 661, 663 (1966); <u>Sanders v. State</u>, 26 Kan. App. 2d 826, 829, 995 P.2d 397, 400 (1999); <u>Spencer v. State</u>, 24 Kan. App. 2d 125, 126, 942 P.2d 646, 647 (1997).  Although an exception exists where:

-8-

> (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; (2) consideration of the question raised for the first time on appeal is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of a trial court may be upheld on appeal although that court may have relied on the wrong ground or assigned a wrong reason for its decision,

State v. Coleman, 271 Kan. 733, 735, 26 P.3d 613, 615 (2001), the Kansas Court of Appeals determined, and this court agrees, that none of these exceptions apply here. Compare Wimbley II at 10 (invoking the second enumerated exception to the rule in order to consider a claim not presented in the initial habeas proceedings) with id. at 21-22 (finding the present claim barred by the rule). Accordingly, the court finds that petitioner's claim of prosecutorial misconduct was properly rejected on an independent and adequate state law basis by the Kansas Court of Appeals.

Moreover, petitioner may not now return to the state system to raise this claim in a subsequent habeas proceeding. The relevant Kansas procedural rule is K.S.A. 60-1507(c), which prohibits successive motions for review. Since petitioner already presented a motion for review under that statute, he is now barred from filing a subsequent motion. That prohibition notwithstanding, Kansas has suggested that "exceptional circumstances" might warrant successive motions; however, "[e]xceptional circumstances . . . are those unusual events or intervening changes in the law which prevented the movant from being aware of and raising all of his alleged trial errors in his first post-conviction proceeding, and they must be such that the ends of justice can only be served by reaching the merits of the subsequent

-9-

application." <u>Brooks v. State</u>, 25 Kan. App. 2d 466, 467, 966 P.2d 686, 688 (1998) (quoting <u>Dunlap v. State</u>, 221 Kan. 268, 270, 559 P.2d 788 (1977)); <u>see also</u> <u>Butler v. Kansas</u>, 2002 WL 31888316, at *2 (10th Cir. Dec. 30, 2002).  There is nothing in the record that shows petitioner was precluded from raising this claim in his prior motion under K.S.A. 60-1507.  Hence, that statute's bar against successive motions means that petitioner is now procedurally barred from raising this issue in the state system.  K.S.A. 60-1507 constitutes an independent and adequate state ground since it is a state statute generally applicable to all collateral attacks.  Therefore, this claim is procedurally defaulted, and may only be considered by this court upon a showing of cause for the default and resulting prejudice, or in order to prevent a fundamental miscarriage of justice.

Cause for default must be something external to petitioner and his counsel, "something that cannot fairly be attributed to [them]." <u>Coleman</u>, 501 U.S. at 753, 111 S. Ct. at 2566.  Petitioner alleges that his default should be excused on this claim because he tried to raise it by filing a motion to have the Kansas Court of Appeals remand the case to the district court for further habeas proceedings.  (Doc. 2 at 26.)   Petitioner claims that he intended to raise this prosecutorial misconduct claim following remand.  <u>Id.</u>  By the time he filed the motion to remand, he had already been appointed counsel.  Based on that fact, the clerk of the appellate courts returned his motion with instructions that he should attempt to have his attorney file it.  (Doc. 2 exh. A.)   The attorney never filed the motion.  Instead, she tried to raise one of the issues in her appellate brief, incorrectly stating that it had been presented in the initial state

habeas proceedings.  <u>Wimbley II</u>, Br. of Appellant at 14-15.  The court of appeals correctly identified that the issue had not been raised below, and declined to consider it, as discussed previously.  <u>Wimbley II</u> at 21-22.  Petitioner claims that between the clerk's having returned his motion without filing it, and his counsel's substandard performance, he should be absolved of responsibility for failing to raise this issue in the state system.

The court disagrees.  Petitioner should have raised the matter in his initial petition for relief under K.S.A. 60-1507.  Had he done so, this issue could have been avoided.  To the extent he blames these errors on his lawyer, he has no constitutional right to counsel in state habeas proceedings.  <u>Coleman</u>, 501 U.S. at 752, 111 S. Ct. at 2566.  Accordingly, he bears the risk of all his counsel's errors in the proceedings, and no such errors will constitute cause for default.  <u>Id.</u> at 752-53.  Moreover, he can show no prejudice by it, because the case on which he relies for remand fails him.  Petitioner claims that remand to the trial court may be had to develop claims of ineffective assistance of counsel under <u>State v. Van Cleave</u>, 239 Kan. 117, 716 P.2d 580 (1986).  (Doc. 2 at 26.)  <u>Van Cleave</u> did state such a rule, but it was in the context of a direct appeal.  <u>Van Cleave</u>, 239 Kan. at 119-20, 716 P.2d at 583.  Indeed, <u>Van Cleave</u> characterized the remand procedure as "an alternative remedy to K.S.A. 60-1507."  <u>Id.</u> at 121, 716 P.2d at 583.  Thus, <u>Van Cleave</u> does not stand for the proposition that a state habeas petitioner may seek a remand to the state habeas court for further development of his claims.  Petitioner cites no additional authority for his argument, nor does he even include the motion for remand in the record.  Rather, the only

information provided by petitioner to support his allegation that he attempted to raise this prosecutorial misconduct claim in his motion to remand is a letter he wrote to the deputy clerk of the state appellate courts, in which he paraphrases the claims he alleges were included in that motion.  (Doc. 2 exh. C.)  The court finds that petitioner has failed to establish cause and prejudice for defaulting this claim.

Finally, a fundamental miscarriage of justice in this context means that the petitioner is probably innocent of the crime.  <u>Phillips v. Ferguson</u>, 182 F.3d 769, 774 (10th Cir. 1999).  Although, as discussed <u>infra</u>, the evidence against petitioner was not overwhelming, it was compelling, and far more than was necessary to permit the jury to convict him of the crimes charged beyond a reasonable doubt.  Hence, the court finds no fundamental miscarriage of justice.  Therefore, this claim of prosecutorial misconduct is unexhausted, and will not be considered on the merits.

Respondents next assert that petitioner failed to exhaust his claim that the trial court erred in instructing the jury and that the court constructively amended the charges against him.  Petitioner presented this claim in the initial habeas proceedings in state court through a supplement to his 60-1507 petition.  (R. Vol. at 72-86.)  However, following the habeas court's denial of his petition, petitioner failed to raise this issue to the state court of appeals.  <u>See generally</u> <u>Wimbley II</u>, Br. of Appellant.  Hence this issue was not exhausted in the state system.  K.S.A. 60-1507(c) is an independent and adequate state law that precludes him from returning to the state system to raise it now.  Therefore, this claim is also procedurally

defaulted.

In his brief, petitioner relies solely on the state appellate clerk's refusal to file his motion to remand, and his attorney's failure file the same, as cause for any default. (Doc. 2 at 26-28.) However, this issue had already been presented to the habeas court and rejected; therefore, remand would have had no bearing on exhaustion. Instead, petitioner elected not to present the claim to the court of appeals. Consequently, he cannot show cause for the default and, as already mentioned, there is no fundamental miscarriage of justice at issue here. Therefore, the court will not consider the merits of this claim.

Continuing, respondents argue that petitioner failed to exhaust his claim that trial counsel was ineffective for failing to object to the trial court's erroneous jury instructions and constructive amendment of the information. A review of the record shows that this issue was never presented in the state proceedings, and is thus unexhausted. Furthermore, it would now be barred by K.S.A. 60-1507(c). Hence, this claim is also procedurally defaulted. Petitioner fails to offer any argument regarding cause for the default, and there was no miscarriage of justice. Accordingly, the court will not consider this claim.

Next, respondents assert that petitioner failed to exhaust his claim that trial counsel was ineffective for failing to move for a mistrial based on juror misconduct. A review of the record shows that, although petitioner argued on direct appeal that the trial court erred by not declaring a mistrial based on juror misconduct, Wimbley I, Br. of Appellant at 6, he never presented a claim that trial

-13-

counsel was ineffective in handling this issue.  In fact, petitioner expressly concedes that he failed to exhaust on direct appeal his claim that his trial counsel was ineffective for not requesting a mistrial.  (Doc. 2 at 65.)  Moreover, a review of his state habeas proceedings shows that, although he had thoroughly presented (and was therefore obviously aware of) his juror misconduct claim on direct appeal, for some unknown reason he failed to present his claim of ineffective assistance of trial counsel to the state habeas courts. This claim is thus unexhausted, and procedurally defaulted under K.S.A. 60-1507(c).  Petitioner shows no cause for his failure to raise the claim; and, based on the discussion, _infra_, regarding the underlying issue of juror misconduct, along with the cumulative evidence at trial strongly implicating defendant's guilt, the court finds that refusing to consider the merits of this claim will not result in a fundamental miscarriage of justice.

Finally, respondents claim that petitioner failed to exhaust any claims of ineffective assistance of appellate counsel.  The state court proceedings reveal that petitioner never presented a claim of ineffective assistance of appellate counsel, although he clearly could have done so in his state habeas case.  Like the preceding claims, any claims of ineffective assistance of appellate counsel are unexhausted, and further proceedings in the state court are barred by 60-1507(c). Plaintiff shows no cause for default.  Lacking any indication that refusal to hear the claims amounts to a fundamental miscarriage of justice, the court will not consider the merits of any such claims.

B.  Sufficiency of the Evidence

Turning now the merits of the remaining claims, petitioner argues

-14-

that the evidence presented on the first-degree murder charge was insufficient to support the jury's verdict.   When considering sufficiency of the evidence, the court views the evidence in the light most favorable to the prosecution.   <u>Spears v. Mullin</u>, 343 F.3d 1215, 1238 (10th Cir. 2003).   Under that standard, habeas relief may only be granted if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."   <u>Id.</u> (quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 319, 324, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). Though it involves factual issues, a challenge to the sufficiency of the evidence is reviewed for legal error.   <u>Id.</u>   Accordingly, under AEDPA the court is limited to determining whether the Kansas Supreme Court reasonably applied the <u>Jackson</u> standard in this case.   <u>Id.</u>

Under Kansas law, in order to convict petitioner of first degree murder, the jury had to conclude that he intentionally killed the victim with premeditation.   <u>Wimbley I</u>, 271 Kan. at 847-48, 26 P.3d at 662 (citing K.S.A. 21-3401(a).)   The evidence admitted at trial showed that petitioner and the victim shared an intimate relationship punctuated by episodes of violence.   (R. XII at 154-57, 170-75.)   Her body was found approximately two blocks from the residence where petitioner lived.   <u>Id.</u> at 55-56.   She had been shot seven times at close range.   <u>Id.</u> at 105-16.   From this, the jury was entitled to conclude that whoever killed her did so intentionally.   Moreover, the number of times a victim is shot, stabbed, or otherwise struck is one factor from which a jury may infer premeditation.   <u>State v. Verge</u>, 272 Kan. 501, 511, 34 P.3d 449, 456 (2001).

As far as tying petitioner to the murder, the state showed that a bloody pillow case found near the victim matched another pillowcase

-15-

found at petitioner's residence.  (R. XII at 63-64; XIII at 403-04.)
Likewise, the state put on evidence that spots of the victim's blood
were found at the residence.  (R. XIV at 620-22.)  On the night of the
murder, prior to discovering the body, police were called to a home
near petitioner's residence where petitioner's car was found abandoned
in the driveway.  (R. XIII at 300-01, 368-71.) Petitioner admits to
having abandoned the car there that night due to mechanical problems.
(Doc. 2 at 1, 4.)  A neighbor reported discovering a bloody t-shirt
near the car.  (R. XIII at 302, 411-12.)  DNA testing of the blood
showed that it was consistent with that of the victim.  (R. XIV at
621.)  Furthermore, police discovered a nine-millimeter pistol on the
ground across the street from the abandoned car.  Id. at 424.
Forensic testing showed that this was the murder weapon.  (R. XV at
667-84.)  Police also discovered two spent shell casings from the
murder weapon at petitioner's residence, as well as a nine-millimeter
cartridge holder bearing petitioner's fingerprints.  (R. XII at 144-
45; XIV at 425-27, 551-52.)

Adding to the evidence linking petitioner to the murder, the
state provided testimony from a witness who was in petitioner's
residence the night of the killing.  She claimed that petitioner
returned home sometime after 10:00 P.M. and consulted with his uncle,
the owner of the home, after which the uncle provided him with some
liquid bleach.  (R. XIII at 381-86.)  Petitioner proceeded to apply
the bleach to an area of the carpet, claiming that he was trying to
clean the place where he had vomited earlier in the evening.  Id.
Upon searching the home, police discovered not one, but three, empty
bleach bottles in the garbage in a home without a washing machine.

-16-

(R. XIV at 559-62.)  Furthermore, DNA testing of the carpet in or near the area where the bleach was applied revealed DNA consistent with the victim's blood.[3]  Id. at 621-22.  Finally, the state provided testimony from another witness who testified that she saw the victim's dead body on the front porch of the residence on the night of the murder.  Id. at 487.  Collectively, this evidence was more than sufficient to allow the jury to conclude that petitioner killed the victim at his residence with the pistol, dumped her body a few blocks away, abandoned his defective automobile, attempted to dispose of the murder weapon and the bloody t-shirt, then returned home to clean up the evidence and bleach the blood stains out of the carpet.

Turning to the issue of premeditation,

> [p]remeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct.  State v. Rice, 261 Kan. 567, 587, 932 P.2d 981 (1997).  Premeditation and deliberation may be inferred from the established circumstances of the case, provided the inference is a reasonable one.  In such a case, the jury has the right to make the inference.  State v. Buie, 223 Kan. 594, 597, 575 P.2d 555 (1978).

State v. Alvidrez, 271 Kan. 143, 148, 20 P.3d 1264, 1268 (2001). Factors from which the jury may infer premeditation include the type of weapon used, the number of times the victim was shot, whether the shots were delivered to vital areas of the victim's body, whether

---

[3] Petitioner challenged the conclusion that he was bleaching the area where the victim's blood stained the carpet, noting that the witness claimed never to have seen any blood on the carpet when she entered the house. (Doc. 18 at 4.)  However, the court notes that the witness failed to suggest that she saw the former contents of petitioner's stomach on the floor either, which would have been consistent with petitioner's story.  Moreover, the jury was entitled to question why someone would voluntarily ruin carpet with bleach in order to clean up vomit.

lethal shots were delivered after the victim was incapacitated, the assailant's conduct before and after the murder, and lack of provocation. <u>State v. Pabst</u>, 268 Kan. 501, 512-13, 996 P.2d 321, 329 (2000); <u>Verge</u>, 272 Kan. at 511, 34 P.3d at 456; <u>State v. Henson</u>, 221 Kan. 635, 639, 562 P.2d 51, 56-57 (1977).

Here, the evidence showed that the victim was shot seven times at close range with a handgun. (R. XII at 105-116.) The jury was entitled to infer that at some point between the first and last shots, petitioner had an opportunity to reflect upon his actions and decide to continue firing bullets into the victim's body. The bullets struck her in the head, neck, and abdomen. <u>Id.</u> The coroner who examined the body specifically testified that two of the wounds were individually capable of incapacitating the victim. <u>Id.</u> at 110, 113. One of those bullets went through her tongue, the back of her throat, and severed a carotid artery before exiting through the back of the victim's head, <u>id.</u> at 109-10, while the other bullet severed a carotid artery, a jugular vein, and the victim's spinal cord. <u>Id.</u> at 112. With at least two, and arguably more, incapacitating gunshot wounds, the jury was entitled to conclude that at least one lethal shot was fired after the victim had been incapacitated. Continuing, petitioner attempted to hide the crime by disposing of the body and bleaching the carpet in his residence to remove the blood stains. The body was disposed of in a secluded area not far from petitioner's home. <u>Id.</u> at 56-57. There was also evidence that the victim had previously expressed profound fear that petitioner would inflict severe harm or even death upon her if she angered him. <u>Id.</u> at 178; XIII at 361-62. Collectively, these facts were more than sufficient to allow the jury

-18-

to conclude that petitioner killed the victim with premeditation.

Petitioner countered all this evidence with two alibi witnesses who claimed that he was elsewhere at the time of the murder.  Eugene Langford testified that, on the evening of the murder, he and petitioner played video games for several hours at petitioner's residence, after which they went to a local pool hall for several more hours.  (R. XVI at 884-91.)  Langford testified that he was with petitioner until approximately 2:00 A.M. on February 10th.  He further testified that after they split up, petitioner spent the remainder of the night with another female, Tracy Williams.  Williams corroborated that testimony, although she was unable to specify the time when petitioner arrived at her home.  Id. at 876, 880.

Although the jury might have believed these alibi witnesses, they were not required to do so.  Instead, the jury was entitled to conclude that they were lying.  In fact, there were problems with Langford's testimony that may well have called his veracity into question.  First of all, Langford testified that he was in petitioner's residence during the entire visit in which petitioner arranged to borrow his uncle's jeep.  Id. at 889-90.  However, Langford specifically testified that he saw absolutely no cleaning activities occurring during that visit.  Id. at 889-90, 902.  By contrast, Paris Andrews testified that petitioner bleached the living room carpet during this visit.  Similarly, Langford's discussion of their return from the pool hall, only to immediately borrow the jeep and return to the pool hall must have raised some jurors' eyebrows. Id. at 890-91.  Why would Langford and petitioner decide to leave the bar to drive a few blocks home only to turn around and borrow another

-19-

vehicle so they could immediately return to the place they just left? While this story was plausible, under the circumstances, it was not above scrutiny. The jury obviously concluded that the alibis were concocted, and it was the jury's province to do precisely that.

Turning now to the firearm count, the evidence was also sufficient to support the conviction for criminal possession of a firearm. The only element in that crime that was disputed was whether petitioner actually possessed the gun. (R. XIII at 298.) Since the evidence was sufficient to support a conviction for killing the victim with a handgun, it was necessarily sufficient to show that he possessed the gun.

The Kansas Supreme Court concluded that the evidence was sufficient to uphold the jury verdict on both charges. <u>Wimbley I</u>, 271 Kan. at 849-50, 26 P.3d at 663-64. That conclusion was neither contrary to, nor an unreasonable application of, <u>Jackson</u>. Accordingly, petitioner's application is DENIED on these claims.

C. Evidence of Prior Incidents of Domestic Violence

Petitioner next objects to the admission of evidence that showed how he viciously beat the victim on various occasions. (Doc. 2 at 40.) On direct appeal, the Kansas Supreme Court held this evidence was properly admitted under a well-established rule that allowed evidence of prior conduct to show the ongoing violent nature of the relationship between the parties. <u>Wimbley I</u>, 271 Kan. at 853, 26 P.3d at 665-66. According to the state court, the evidence of prior abuse by petitioner allowed the jury to make the "inference that the defendant, having once before beaten [the victim] when she discussed leaving him, and having acted violently toward her in the past, killed

-20-

her when she contemplated making a final break from him."

A federal habeas court may not grant relief based on a state court's error in applying its own law absent a finding that the state court's ruling was so arbitrary and capricious as to constitute an independent constitutional violation. <u>Fields v. Gibson</u>, 277 F.3d 1203, 1220 (10th Cir. 2002) (citing <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)). The Tenth Circuit has provided the following guidance when reviewing state evidentiary rulings in a habeas case brought under 28 U.S.C. § 2254:

> We may not provide habeas corpus relief on the basis of state court evidentiary rulings "unless they rendered the trial so fundamentally unfair that a denial of constitutional rights results." <u>Mayes v. Gibson</u>, 210 F.3d 1284, 1293 (10th Cir.), cert. denied, 531 U.S. 1020, 121 S.Ct. 586, 148 L.Ed.2d 501 (2000). "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements," when engaged in such an endeavor a federal court must "tread gingerly" and exercise "considerable self-restraint." <u>United States v. Rivera</u>, 900 F.2d 1462, 1477 (10th Cir. 1990).

<u>Duckett v. Mullin</u>, 306 F.3d 982, 999 (10th Cir. 2002). With respect to admission of evidence of prior bad acts, the court cannot grant relief "unless the probative value of such evidence is so greatly outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law." <u>Knighton v. Mullin</u>, 293 F.3d 1165, 1171 (10th Cir. 2002) (quoting <u>Duvall v. Reynolds</u>, 139 F.3d 768, 787 (10th Cir. 1998)).

Here, the evidence was highly probative. Just as the Kansas Supreme Court stated, this evidence showed that petitioner was prone to treat the victim violently; and, more importantly, on occasions when she expressed an intent to break off their relationship,

petitioner responded with extraordinary violence.  Since the evidence established that the victim was in the process of breaking off the relationship with petitioner, this additional evidence regarding how he had responded previously to similar acts was highly probative.

Petitioner argues that any probative value was outweighed by the risk of unfair prejudice.  While that might be the case if the prosecution had been permitted to bring in evidence of prior <u>unrelated</u> crimes or misconduct, <u>see, e.g., Old Chief v. U.S.</u>, 519 U.S. 172, 180-81, 117 S. Ct. 644, 650, 136 L. Ed. 2d 574 (1997) (discussing unfair prejudice in light of the petitioner's prior unrelated conviction for the same offense),[4] the evidence here went to specific instances where petitioner responded violently to <u>this victim</u> under <u>these same circumstances</u>.  Under such circumstances, the risk is much lower that the jury would convict on the basis that petitioner was a person of bad character who has a propensity for committing the crimes charged.  Rather, under these circumstances, the jury is more likely to base a conviction on the conclusion that this was the continued escalation of a specific, ongoing, violent relationship, culminating in the death of the victim.  While that conclusion is prejudicial, it is not unfair.  Based on the high probative value of the evidence, and its low likelihood of producing unfair prejudice, the court finds that the trial was not rendered fundamentally unfair.  Petitioner's request for relief on this claim is DENIED.

---

[4] Petitioner relies heavily on <u>Old Chief</u>.  (Doc. 2 at 42-44.) However, <u>Old Chief</u> was a federal criminal case interpreting the Federal Rules of Evidence, which are not applicable to petitioner's case.  The court cites <u>Old Chief</u> merely as a general example of the type of prior bad acts that give rise to prejudice that is unfair.

D.  Ineffective Assistance of Trial Counsel

Petitioner presents several claims that his trial counsel was constitutionally deficient.  The first of these revolves around the use of DNA evidence in the case.  At the preliminary hearing, the state presented evidence that petitioner's DNA was found on the murder weapon.  (Doc. 2 at 59.)  DNA from the gun was found to match a sample of petitioner's DNA acquired by law enforcement in a previous case in which petitioner had been shot.  Id.  Petitioner now asserts that trial counsel's failure to challenge the accuracy of the DNA testing at the preliminary hearing was constitutionally deficient.  (Doc. 2 at 64.)  Although he presented this issue in his supplemental petition to the state habeas court, Wimbley II, R. at 75-76, he failed to present is to the state court of appeals.  The issue is therefore defaulted.  Petitioner shows no cause for the default, and there is no indication that failure to consider the issue will result in a fundamental miscarriage of justice.  Accordingly, the issue is not properly before the court.

Petitioner next argues that his trial counsel failed to adequately investigate the DNA evidence against him and, more specifically, that counsel should have done an independent DNA analysis.  In reviewing petitioner's ineffective assistance claims, the Kansas Court of Appeals properly relied on the standards set forth in Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Wimbley II at 9.  A claim for ineffective assistance of counsel in violation of the Sixth Amendment requires petitioner to show that 1) his counsel's performance fell below an objective standard of reasonableness; and 2) but for his counsel's

-23-

unreasonable errors, there is a reasonable probability that the outcome of the proceeding would have been different.  Williams v. Taylor, 529 U.S. 362, 390-91, 120 S. Ct. 1495, 1511-12, 146 L. Ed. 2d 389 (2000); Strickland, 466 U.S. at 688, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  In evaluating the performance of trial counsel, the Supreme Court provided the following guidance:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." See Michel v. Louisiana, supra, 350 U.S., at 101, 76 S. Ct., at 164.
>
> . . .
>
> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 689-90, 104 S. Ct. at 2065-66 (emphasis added). Thus, under this standard, counsel's performance is presumed competent, and petitioner bears the burden of rebutting that presumption.

The Kansas Court of Appeals found that, contrary to petitioner's assertions, his trial counsel had performed an adequate investigation. Wimbley II at 20-21. In particular, the court of appeals concluded as a matter of fact that trial counsel had retained a DNA expert, Dean Stetler, who examined the state's DNA evidence and testified that it was unreliable. Id. at 21. The record bears this out. (R. XV at 818-40.) In order to rebut the state court's factual finding, petitioner bears the burden of refuting it by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). He does not even attempt to do so. Instead, he merely argues that defense counsel should have ordered independent DNA testing. (Doc. 2 at 59.)

Petitioner's argument fails. Assessing the situation from defense counsel's perspective at the time, by the time petitioner was made aware that the state found his DNA on the murder weapon, the state's laboratory testing was already completed. Experienced defense counsel know that, once a DNA profile has been obtained, the chances of obtaining different results by running a new lab test are quite small. Here, defense counsel's theory was that petitioner's DNA may have gotten on the gun through cross-contamination with other evidence seized during the investigation, or (as suggested by Stettler) through cross-contamination on the laboratory work bench. (R. XV at 837-40.) In either case, if cross-contamination actually occurred, further analysis of the gun would still yield petitioner's DNA. Id. Thus,

if, as petitioner urges, defense counsel had run independent forensic tests, all that would have been accomplished was the production of yet another test showing petitioner's DNA on the gun.  Instead, the more productive course of action would be to discredit the state's results as being the product of shoddy lab work and cross-contamination.  That is exactly what happened here.  Accordingly, the court finds that defense counsel's performance on this matter was not only constitutionally adequate, but probably the wisest course that any competent lawyer could have chosen.  The Kansas Court of Appeals' conclusion to that effect was not an unreasonable application of Strickland.

Petitioner next claims that his lawyer failed him by stating in opening argument that the state would likely put on evidence that his DNA was on the murder weapon.  Ultimately, the state put on no such evidence.  The state appellate court found no error in counsel's actions.  Instead, the court of appeals found that, based on the fact that the state had introduced this evidence at the preliminary hearing, defense counsel's efforts in opening argument were a calculated effort to explain away that evidence and discredit it from the beginning.  Wimbley II at 17-20.

The court agrees with the Kansas Court of Appeals.  Defense counsel had no way of knowing that the state would decide not to put on the DNA evidence linking petitioner to the murder weapon.  Defense counsel's remarks could not be construed as a concession that the state's evidence was accurate.  Rather, they clearly show that defense counsel was preparing the jury to look skeptically on this evidence on the basis of shoddy practices in handling the evidence prior to

-26-

analysis.   Indeed, it is quite possible that because of defense counsel's remarks the state chose not to put on this evidence. Petitioner asks the court to condemn defense counsel's actions based on hindsight.   That approach is strictly prohibited by Strickland. Based on the information possessed by defense counsel at the time of opening arguments, his actions were not only reasonable, but commendable.   The state appellate court's conclusions were not an unreasonable application of Strickland.

For his final point of error, petitioner complains that he was denied a fair trial when a juror failed to disclose during voir dire that she had been the victim of domestic violence from her husband. (Doc. 2 at 65.)   The Kansas Supreme Court aptly summarized the relevant facts as follows:

> The juror in question was B.X., who was originally from Laos. After voir dire, the State attempted to use a peremptory strike on B.X., but a Batson challenge was raised and she remained on the jury. During voir dire, both the State and the defendant asked the prospective jurors whether they or anyone they knew had been a victim of domestic violence. B.X. remained silent throughout such questioning.
> During a recess on the first day of trial, however, jurors informed the trial court that B.X. had confided to them that she was currently a victim of domestic violence by her husband. The trial court immediately questioned B.X. and the other jurors individually.
> B.X. told the court that when one of the other jurors jokingly asked how her husband got to be a "home husband," she began crying and told him that she was a victim of domestic violence. She admitted that she did not say anything during voir dire because the situation was too personal. B.X. stated that she cried for 4 or 5 minutes in the jury room. Following this testimony, B.X. was dismissed from the jury.
> The trial court then interviewed the jurors. All of them indicated that B.X.'s story would not affect their ability to be impartial.

-27-

> At the close of the interviews, the trial
> court asked if there were any motions. Defense
> counsel then stated:
>> "Your Honor, I have spoken to my
>> client both before we began this
>> selection-not selection, I'm sorry,
>> this inquiry and after hearing the
>> responses to the questions posed, and
>> my client has advised me, and I'm
>> inclined to agree, we will not be
>> making a motion at this time for a
>> mistrial."
>> The defendant now claims that
>> notwithstanding his decision not to seek a
>> mistrial, the trial court should have declared a
>> mistrial sua sponte.

Wimbley I, 271 Kan. at 851, 26 P.3d at 664.

As an initial matter, the court notes that petitioner briefed this issue to the Kansas Supreme Court exclusively on the basis of state cases and statutes.  Wimbley I, Br. of Appellant at 6-12. Likewise, in deciding the issue, the state supreme court relied exclusively on state precedent.  Wimbley I, 271 Kan. at 852, 26 P.3d at 665.  Nonetheless, out of an abundance of caution, the court construes petitioner's claim that juror misconduct denied him "[t]he [r]ight [t]o [a] [f]air and [i]mpartial [j]ury" as stating a claim for a due process violation.  See Smith v. Phillips, 455 U.S. 209, 214, 102 S. Ct. 940, 944, 71 L. Ed. 2d 78 (1982).  Although the Kansas Supreme Court did not rely on Smith in deciding this issue, its decision should still be upheld unless it was contrary to Smith.  See Williams, 529 U.S. at 412-13.

According to Smith, "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Smith, 455 U.S. at 215, 102 S. Ct. at 945.  That is precisely what happened here.  Moreover, unlike Smith, where the

-28-

Supreme Court found that a hearing conducted <u>after</u> the trial did not violate due process, in this case the hearing was conducted <u>during</u> the trial, where all parties had the opportunity to probe juror bias before a verdict was ever rendered. (R. XIII at 225-78.) Petitioner had the burden to demonstrate bias on the part of any juror. <u>See</u> <u>Smith</u>, 455 U.S. at 215, 102 S. Ct. at 945. After extensive questioning, he failed to meet that burden. Indeed, upon completing the very examination of jurors intended to preserve his rights, he urged the trial court <u>not</u> to declare a mistrial. (R. XIII at 277.)

In <u>Smith</u>, the Supreme Court provided the following guidance applicable to the trial of this case:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in <u>Remmer</u> and held in this case.

<u>Smith</u>, 455 U.S. at 217, 102 S. Ct. at 946. The record shows that the trial court complied with the mandate from <u>Smith</u> to hold a hearing on the issue of juror bias. Having done so, the state court's determination that no bias existed, buttressed by petitioner's urging to the same effect, is a factual conclusion entitled to deference. 28 U.S.C. § 2254(e)(1).

Here, petitioner makes no effort to rebut this factual finding.

Instead, he focuses his argument on how his defense counsel was ineffective in not moving for a mistrial.  (Doc. 2 at 65-69.) Likewise, his belatedly filed motion for an evidentiary hearing provides no indication that he is prepared to present any additional evidence relevant to deciding this issue. (Doc. 19.)  Accordingly, the court finds that the state trial court's factual determination that the remaining jurors could be fair and impartial is entitled to deference.  The Kansas Supreme Court's resolution of this matter was not contrary to <u>Smith</u>.  Petitioner's request for relief is DENIED.

## III. CONCLUSION

For the foregoing reasons, petitioner's application for a writ of habeas corpus is DENIED.  Likewise, his motion for an evidentiary hearing is also DENIED. (Doc. 19.)  A motion for reconsideration is neither invited nor encouraged.  Any such motion shall not exceed three double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (D. Kan. 1992).  No reply shall be filed.  Identical requirements and restrictions shall apply to any application for certificate of appealability or any other submission, however styled, directed to this Memorandum and Order.

IT IS SO ORDERED.

Dated this <u>7th</u> day of  July, 2005, at Wichita, Kansas.

<u>s/   Monti Belot   </u>

Monti L. Belot
UNITED STATES DISTRICT JUDGE

-30-